## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| CARLA BROWNLEE, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) CASE NO. |
| VS. | ) |
| | ) |
| 41-B, DISTRICT COURT, | ) HON. |
| | ) |
| DEFENDANT. | ) |
| | ) |
| | ) |
| | ) |

*Plaintiff asserts there is no other civil action pending in this Honorable Court or any other Court arising out of the same transaction and occurrence.*

## COMPLAINT

PLAINTIFF CARLA BROWNLEE, by and through her attorneys, CARLA D. AIKENS, P.L.C., submit the following Complaint against 41-B District Court.

## JURY DEMAND

COMES NOW PLAINTIFF Carla Brownlee and hereby makes her demand for trial by jury.

## PARTIES AND JURISDICTION

1.     At all times relevant to this complaint, Plaintiff Carla Brownlee ("Plaintiff" or "Ms. Brownlee") was a resident of Macomb County in the State of Michigan.

2.      Defendant, 41-B District Court ("Defendant"), has an operational address at 22380 Starks, Clinton Township, Macomb County in the State of Michigan.

3.      Venue is proper in this Court, because the violations of Title VII of the Civil Rights Act of 1964, 42 USC 2000e et seq. giving rise to Plaintiff's claims occurred in this district.

4.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343(a)(4) and 28 U.S.C. § 1331.

5.      This action is brought in this Court on the basis of federal question jurisdiction, pursuant to Title VII of the Civil Rights Act of 1964, 42 USC 2000e et seq.

## STATEMENT OF FACTS

6.      Plaintiff is an African American woman.

7.      On or around September 27, 2020, Ms. Brownlee notified Judge Carrie Fuca and James McGrail, the court administrator, that there were issues concerning a specific probation file.

8.      Specifically, that a white male probation officer, falsified the filed one of the files.

9.      Upon information and belief, the probation officer did not receive any discipline from James McGrail.

2

10.   Ms. Brownlee brought this issue to the attention of Chief Judge Sebastian Lucido in March of 2020.

11.   Upon information and belief, nothing was done, despite Judge Fuca inquiring about the situation on multiple times.

12.   On or about May 8, 2020, Ms. Brownlee was notified the rest of the staff were being laid off.

13.   Ms. Brownlee and one other person in probation would be allowed to stay in probation with her only input being if the other person should be a clerk or probation officer.

14.   No discussion was made as to what Ms. Brownlee needed to stay afloat given that the probation office had seven employees.

15.   The probation officer who committed fraud was selected by Defendant to continue working in probation during the reduced staff period despite the falsification issues.

16.   On August 12, 2020, Ms. Brownlee had a conversation with Jim McGrail about her not being notified about changes that affect her and the probation department

17.   During this conversation, she expressed feelings of exclusion and disrespect by management towards her.

18.   These actions by management caused the staff to follow suit.

3

19.     On September 23, 2020, Ryan Zemke was putting files in "bench warrant status," without the files being in LEIN at the time.

20.     Upon information and belief, nothing was done about his actions.

21.     On or about May 21, 2021, the probation officer who committed fraud went to McGrail asking to go to a probation conference rather than go to Ms. Brownlee as he had done in years past.

22.     The probation officer who committed fraud overrode the chain of command in an effort to undermine Ms. Brownlee's authority.

23.     Further, he was set to retire soon and the conference was to develop employees in their roles handling probationary issues.

24.     During the conference, this same probation officer only showed up to the parties, golf outings, or other such events, ignoring the conference sessions.

25.     Ms. Brownlee brought this to the attention of McGrail, who stated that the officer did not need to attend those sessions.

26.     This probation officer was essentially allowed to use the conference as a vacation and as a way to ignore the work on his desk until his retirement.

27.     On or about August 9, 2022, there were no clerks in probation with Stefanie Goodman, who was helping with probation while handling criminal dockets and phone calls.

28.    McGrail informed Ms. Brownlee that Goodman would be going back fully to the criminal department to "keep questions down."

29.    Ms. Brownlee requested that Goodman be allowed to continue to assist as the workload of Ms. Brownlee kept increasing, but the request was ignored.

30.    The next day, Brownlee met with McGrail and the criminal division about Ryan Zemke not doing his job; however, nothing was done.

31.    Around December of 2022, Thomas Jury, a white male, was transferred to the probation department, despite numerous documented issues with his prior role in preparing the judge's criminal docket.

32.    Ms. Brownlee voiced concerns about the transfer, as she stated it would not be a good fit due to the volume of work and the need to effectively multitask.

33.    Again, =Ms. Brownlee's concerns were ignored.

34.    Around January or February of 2023, Jury was promoted to probation officer.

35.    Ms. Brownlee was involved in the interview process and selected Jessica D. due to her work history.

36.    However, Judge Lucido stated Jury's two months of probation experience placed him over Jessica D.

37.     Judge Lucido further mentioned Jury needed to be hired because of Judge Feminineo.

38.     Jury and Jury's mother were former employees at Feminineo's law firm, with Jury having known issues regarding a housesitting incident for Judge Feminineo.

39.     McGrail and Ms. Brownlee disagreed with the decision, voicing their concerns during the discussion.

40.     While the discussion was occurring, Judge Feminineo came into the room and stated he would understand if Jury did not receive the position.

41.     Jury did eventually receive the position, ignoring the concerns presented about his ability and qualifications.

42.     Ms. Brownlee was determined for Jury to succeed, as his performance would reflect on her.

43.     Despite her dedication and hard work, new employees would be told "you do not want to work in probation," by Ryan Zemke when being shown around the building.

44.     Zemke would also refer to Ms. Brownlee as "the problem child."

45.     This animosity spread throughout the court, as the clerks began to despise the probation department.

46.     One such occurrence came during a guest speaker group exercise where Ryan Zemke stated in front of 30 employees and the judges that they should light a match and blow up the probation department.

47.     On or about February 16, 2023, Jury requested the day off, stating he had a doctor's appointment that was going to take several hours.

48.     Jury stated there were two days available for the appointment.

49.     Ms. Brownlee looked at the docket for those days and informed him which day would work better given the workload presented to the probation department.

50.     Jury ignored Ms. Brownlee, choosing the more inconvenient day and refusing to get a doctor's note for the appointment.

51.     Ms. Brownlee explain that the Union may require one, since she would need him to come in for a little while prior to the appointment to help out.

52.     In a meeting with McGrail, Jury was argumentative with Ms. Brownlee and McGrail took the opportunity to blame Ms. Brownlee for failing to properly let Jury know about the doctor's note requirements.

53.     Ms. Brownlee pointed out that requirement is in the union contract and it is not her job to remind Jury about the required provisions of the CBA.

7

54.     In the days that followed, Ms. Brownlee noticed a new tattoo that encompassed most of Jury's arm, suggesting there was no doctor's appointment at all.

55.     McGrail refused to make Jury produce a note but did require Jennifer McTaggart to produce one.

56.     On February 27, 2023, McGrail notified Ms. Brownlee that Jury had quit.

57.     In March of 2023, Ms. Brownlee met with McGrail about streamlining the probation process and requesting a specific clerk position to speed the process along.

58.     McGrail agreed with Ms. Brownlee's suggestions and stated Julie would be the clerk providing assistance.

59.     Ms. Brownlee went on vacation on March 30, 2023 and received a text that the criminal department received 20 minutes of training and would be taking the files to "catch-up" probation.

60.     However, the hasty training led to numerous errors and probationary processing issues.

61.     On or about April 6, 2023, Debra Hernandez was overseeing the show cause docket and became antagonistic toward the criminal defendants appearing.

62. Hernandez stated "if you don't have any money to set up a payment plan, get out of the Zoom meeting and come back when you find some money to set up a payment plan."

63. This caused numerous criminal defendants to leave the Zoom and not reenter the show cause hearing, meaning that this statement caused multiple bench warrants to be issued.

64. This issue occurred multiple times, with Ms. Brownlee bringing it to McGrail's attention who dismissed it as a lie, despite Jaimie Connolly also being told about the same issue.

65. These issues continued to persist over the next few months.

66. On or about December 7, 2023, Ms. Brownlee texted McGrail to set up a call.

67. During the call, Ms. Brownlee discussed her medical insurance and FMLA paperwork, as she had suffered an injury outside of work that had caused a disability.

68. McGrail stated there was an issue with the paperwork and Ms. Brownlee would need to get a second opinion after he spoke with Tim Tomlinson, the court's attorney.

69. Later on December 7th, McGrail stated that" a fitness for duty" doctor had appointments the next day in Fraser.

70.    Without Ms. Brownlee responding, McGrail scheduled an appointment for 2:30 pm on December 8th.

71.    Ms. Brownlee tried to remedy the situation, as it caused numerous issues with her case manager who could not be available at the time McGrail set.

72.    McGrail knew Ms. Brownlee had a case manager.

73.    Ms. Brownlee felt pressured by McGrail and the doctor to attend immediately, despite her schedule and situation not being considered.

74.    Upon information and belief, McGrail revealed her information to a Rachel Friday for a specific appointment.

75.    McGrail and Rachel Friday are believed to be friends.

76.    McGrail was trying to send Ms. Brownlee to an FNP, despite her original FMLA paperwork coming from Dr. David Weingarden.

77.    In late 2023, Ms. Brownlee received an email and letter stating that she was unfit for work and that her job would be posted.

78.    Ms. Brownlee attempted to fix the issue by contacting McGrail and included additional documentation to support her medical issues.

79.    Both McGrail and Judge Lucido stated there would be no additional time and stated they would pay her for 397 hours of combine catastrophic time and PTO.

80.    Subsequently, Ms. Brownlee was prevented from using this accumulated time and was ultimately removed from her position.

81.    Ms. Brownlee submitted a charge to the EEOC on July 16, 2024, Charge No. 471-2024-05175.

82.    A right to sue letter was issued on July 18, 2024, and this lawsuit followed.

83.    Plaintiff requests relief as described in the Prayer for Relief below.

<u>**COUNT I**</u>
**HARRASMENT & DISCRIMINATION ON THE BASIS OF RACE IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. 2000e et seq. ("Title VII")**

84.    Plaintiff incorporates by reference all allegations in the preceding paragraphs.

85.    At all material times, Defendant was an employer and Plaintiff was an employee covered by, and within the meaning of, Title VII, as amended.

86.    Defendant's conduct, as alleged herein, violated Title VII of the Civil Rights Act of 1964, which makes it unlawful to harass or discriminate an employee on the basis of that employee's skin color.

87.    A respondeat superior relationship existed because Defendant and its agents had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct Plaintiff's daily work activity, as alleged in the statement of facts.

88.     Moreover, a respondeat superior relationship existed because Defendant and its agents had the ability to undertake or recommend tangible decisions affecting all Plaintiffs and the authority to direct those Plaintiffs' daily work activities, as alleged in the statement of facts.

89.     Plaintiff is an African-American woman, and, as a result, is a member of a protected class pursuant to Title VII.

90.     Plaintiff was subjected to offensive communication and/or conduct on the basis of her membership in this protected class, as set forth in the facts section above, including but not limited to treating her differently and holding her to a different standard than those who were not African-American, culminating in her termination.

91.     Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

92.     Plaintiff notified Defendant, through its agents, of the unwelcomed conduct and communication and Defendant failed to remedy the unwelcomed conduct or communication, including but not limited to subjecting him to worse treatment than hiss colleagues, on the basis of his race.

93.     The unwelcomed conduct or communication was intended to or in fact did substantially interfere with Plaintiff's employment and created an intimidating, hostile, or offensive work environment, as alleged in the statement of facts.

94.     As a proximate result of the Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

## COUNT II

### RETALIATION IN VIOLATION OF 42 USC § 1981

95.     Plaintiff hereby incorporates by reference the preceding paragraphs of this Complaint, as if fully set forth herein.

96.     42 USC § 1981 prohibits individuals from intentionally discriminating and retaliating against persons who engage in protected activity, including reporting and opposing unlawful acts of race discrimination, in the making and enforcement of contracts.

97.     Defendant's discrimination against Plaintiff as described above is in violation of the rights of Plaintiff afforded her by the First Amendment and the Civil Rights Act of 1866, 42 USC § 1981, as amended by the Civil Rights Act of 1991.

98.     By the conduct described above, Defendant intentionally deprived Plaintiff of the same rights as are enjoyed by individuals who do not report discrimination, and those who are non-African American, to the creation, performance, enjoyment, and all benefits and privileges of their contractual employment relationship with Defendant, in violation of 42 USC § 1981.

13

99.   Plaintiff engaged in activity protected by 42 USC § 1981 when he complained of and opposed unlawful racial discrimination.

100.   The retaliation by Defendant that Plaintiff experienced included his termination, which broke the contract between the parties.

101.   The actions of Defendant and its agents were willful, intentional, in deliberate disregard of and with reckless indifference to the rights and sensibilities of Plaintiff.

102.   As a direct and proximate result of those actions, the terms, conditions, and privileges of Plaintiff's employment were adversely affected, and Plaintiff was unlawfully terminated.

103.   But for Defendant's unlawful discrimination against Plaintiff for opposing racial discrimination, Plaintiff would not have suffered damages as set forth herein including his termination.

104.   As a direct and proximate result of Defendant's wrongful acts, Plaintiff sustained injuries and damages including, but not limited to, loss of earnings and earning capacity, loss of career opportunities, loss of fringe and pension benefits, outrage and humiliation, mental anguish, anxiety about their future, physical and emotional distress, loss of professional reputation and loss of the ordinary pleasures of everyday life.

## COUNT III

### RACIAL DISCRIMINATION IN VIOLATION OF 42 USC § 1981

105.   Plaintiff hereby incorporates by reference the preceding paragraphs of this Complaint, as if fully set forth herein.

106.   42 USC § 1981 prohibits employers from intentionally discriminating against individuals, including employees, in the making and enforcement of contracts.

107.   Defendant's discrimination against Plaintiff as described above is in violation of the rights of Plaintiff afforded her by the U.S. Constitution and the Civil Rights Act of 1866, 42 USC § 1981, as amended by the Civil Rights Act of 1991.

108.   By the conduct described above, Defendant intentionally deprived Plaintiff of the same rights as are enjoyed by individuals who are non-African American, to the creation, performance, enjoyment, and all benefits and privileges of their contractual employment relationship with Defendant, in violation of 42 USC § 1981.

109.   The intentional discrimination on the basis of Plaintiff's race by Defendant that Plaintiff experienced included his termination, which broke the contract between the parties.

110.   The actions of Defendant and its agents were willful, intentional, in deliberate disregard of and with reckless indifference to the rights and sensibilities of Plaintiff.

111.   As a direct and proximate result of those actions, the terms, conditions, and privileges of Plaintiff's employment were adversely affected, and Plaintiff was unlawfully terminated.

112.   As a direct and proximate result of Defendant's wrongful acts, Plaintiff sustained injuries and damages including, but not limited to, loss of earnings and earning capacity, loss of career opportunities, loss of fringe and pension benefits, outrage and humiliation, mental anguish, anxiety about their future, physical and emotional distress, loss of professional reputation and loss of the ordinary pleasures of everyday life.

## COUNT IV

### RETALIATION IN VIOLATION OF TITLE VII

113.   Plaintiff incorporates by reference all allegations in the preceding paragraphs.

114.   At all material times, Defendant was an employer and Plaintiff was an employee covered by, and within the meaning of, Title VII, as amended.

16

115.   A respondeat superior relationship existed because agents of Defendant had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity.

116.   Defendant's conduct, as alleged herein, violated Title VII which makes it unlawful to harass or retaliate against an employee for engaging in protected activity.

117.   Plaintiff engaged in protected activity, as more fully laid out in the statement of facts, including, but not limited to when Plaintiff spoke with her supervisors about her medical leave, the treatment she received, and other such issues.

118.   Defendant, through its agents, had knowledge that Plaintiff engaged in protected behavior because she reported the issue directly to agents of Defendant.

119.   After Plaintiff engaged in protected activity, Defendant's agents thereafter took adverse employment actions against Plaintiff, as alleged in the of facts, up to and including termination. Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard of Plaintiff's rights.

120.   Plaintiff notified Defendant and its agents of the unwelcomed conduct and communication; however, Defendant failed to remedy the same.

121.    As a proximate result of Defendant's discriminatory and retaliatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

122.    As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

123.    Plaintiff requests relief as described in the Prayer for Relief below.

## <u>COUNT V</u>

## **VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT – INTERFERENCE AND RETALIATION**

124.    Plaintiff incorporates by reference all allegations in the proceeding paragraphs.

125.    At all relevant times, Ms. Brownlee was Defendant's employee within the meaning of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*

126.    At all relevant times, Defendant was an employer within the meaning of the FMLA, 29 U.S.C. § 2601, *et seq.*

127.    Ms. Brownlee fell within the protection of the FMLA as a person with a serious health condition. 29 U.S.C. § 2612(a)(1)(C).

128.    At all relevant times, Ms. Brownlee submitted paperwork to the Defendant about her medical condition.

18

129.  Under the FMLA, Defendant had an obligation to provide Ms. Brownlee with up to 12 weeks of leave for a serious health condition.

130.  In addition, Defendant is prohibited under FMLA from retaliating against Ms. Brownlee for requesting and/or taking FMLA leave.

131.  Notwithstanding Defendant's duties as set forth above, Defendant willfully violated the FMLA by refusing to accept her original determination, scheduling appointments less than 12 hours before the appointment time, refusing to allow her used of accumulated time off, and other such actions as described in the statement of facts and uncovered during the discovery process.

132.  As a direct and proximate result of Defendant's violation of FMLA and retaliation, Ms. Brownlee has suffered and will continue to suffer lost wages, and other economic advantages of employment.

133.  As a direct and proximate result of Defendant's violation of FMLA and retaliation, Ms. Brownlee has suffered and will continue to suffer mental/emotional pain and suffering, including but not limited to loss of enjoyment of a normal life due to irritability, depression, anxiety, worry, humiliation, grief, sadness, anger, and panic attacks.

## COUNT VI

## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT – RETALIATION

134.   Plaintiff incorporates by reference all allegations in the proceeding paragraphs.

135.   Ms. Brownlee brings this suit under a federal law called the Americans with Disabilities Act ("ADA").

136.   Ms. Brownlee claims Defendant discriminated against her by not accommodating her disability.

137.   Under the ADA, to "accommodate" a disability is to make some change that will let a person with a disability perform the job. An accommodation is "reasonable" if it is effective and its costs are not clearly disproportionate to the benefits it will produce.

138.   A reasonable accommodation may include a change in such things as ordinary work rules, facilities, conditions, or schedules.

139.   Once an employer is aware of an employee's disability and an accommodation has been requested, the employer must discuss with the employee whether there is a reasonable accommodation that would permit her to perform the job. Both the employer and the employee must cooperate in this interactive process in good faith.

20

140.   At all relevant times, Ms. Brownlee was an employee of Defendant within the meaning of the Americans With Disabilities Act, 42 U.S.C. § 12111(4)(5).

141.   At all relevant times, Defendant was an employer within the meaning of the Americans With Disabilities Act, 42 U.S.C. § 12111(4)(5).

142.   At all relevant times to this action, Ms. Brownlee was a qualified individual with a disability pursuant to 42 U.S.C. § 12111(8) who, with or without accommodation, could perform the essential functions of her job.

143.   Ms. Brownlee was an individual with a disability within the meaning of 42 U.S.C § 12102, in that she had a physical impairment that substantially limits one or more of her major life activities, who with or without accommodation could perform the essential functions of her job with Defendant.

144.   At all times relevant hereto, Defendant had a duty under the ADA to accommodate Ms. Brownlee for purposes of employment unless the accommodation would impose an undue hardship. Defendant's duty to accommodate Ms. Brownlee includes, but is not limited to, transferring Ms. Brownlee to an available position or providing other such reasonable assistance.

145.   At all times relevant hereto, Defendant could have accommodated Ms. Brownlee's disability without suffering an undue hardship.

146.   Defendant was aware of Ms. Brownlee's disability at the time of Ms. Brownlee's request because Defendant approved FMLA leave.

147.   At all relevant times hereto, Defendant had a duty under the ADA not to discriminate against Ms. Brownlee with respect to compensation or terms, conditions, or privileges of employment because of a disability.

148.   At all relevant times hereto, Defendant had a duty not to retaliate against Ms. Brownlee with respect to her employment, compensation or terms, conditions, or privileges of employment, or to limit, segregate, or classify Ms. Brownlee for employment in any way which deprived or tended to deprive her of employment opportunities or otherwise adversely affect the employment status of Ms. Brownlee, in retaliation for her requesting an accommodation.

149.   Notwithstanding said duties as set forth above, Defendant discriminated against Ms. Brownlee because of her disability.

150.   Defendant failed to provide Ms. Brownlee with a reasonable accommodation and otherwise retaliated against her as stated in the factual allegations.

151.   As a direct and proximate result of Defendant's discrimination and retaliation, Ms. Brownlee has suffered and will continue to suffer lost wages, and other economic advantages of employment.

## COUNT VII

## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT – DISABILITY DISCRIMINATION

152.   Plaintiff incorporates by reference all allegations in the proceeding paragraphs.

153.   Ms. Brownlee brings this suit under a federal law called the Americans with Disabilities Act ("ADA").

154.   Ms. Brownlee claims Defendant discriminated against her by not accommodating her disability.

155.   Under the ADA, to "accommodate" a disability is to make some change that will let a person with a disability perform the job. An accommodation is "reasonable" if it is effective and its costs are not clearly disproportionate to the benefits it will produce.

156.   A reasonable accommodation may include a change in such things as ordinary work rules, facilities, conditions, or schedules.

157.   Once an employer is aware of an employee's disability and an accommodation has been requested, the employer must discuss with the employee whether there is a reasonable accommodation that would permit her to perform the job. Both the employer and the employee must cooperate in this interactive process in good faith.

23

158. At all relevant times, Ms. Brownlee was an employee of Defendant within the meaning of the Americans With Disabilities Act, 42 U.S.C. § 12111(4)(5).

159. At all relevant times, Defendant was an employer within the meaning of the Americans With Disabilities Act, 42 U.S.C. § 12111(4)(5).

160. At all relevant times to this action, Ms. Brownlee was a qualified individual with a disability pursuant to 42 U.S.C. § 12111(8) who, with or without accommodation, could perform the essential functions of her job.

161. Ms. Brownlee was an individual with a disability within the meaning of 42 U.S.C § 12102, in that she had a physical impairment that substantially limits one or more of her major life activities, who with or without accommodation could perform the essential functions of her job with Defendant.

162. At all times relevant hereto, Defendant had a duty under the ADA to accommodate Ms. Brownlee for purposes of employment unless the accommodation would impose an undue hardship.

163. At all times relevant hereto, Defendant could have accommodated Ms. Brownlee's disability without suffering an undue hardship.

164. Defendant was aware of Ms. Brownlee's disability at the time of Ms. Brownlee's request because Defendant approved FMLA leave.

24

165.   At all relevant times hereto, Defendant had a duty under the ADA not to discriminate against Ms. Brownlee with respect to compensation or terms, conditions, or privileges of employment because of a disability.

166.   At all relevant times hereto, Defendant had a duty not to retaliate against Ms. Brownlee with respect to her employment, compensation or terms, conditions, or privileges of employment, or to limit, segregate, or classify Ms. Brownlee for employment in any way which deprived or tended to deprive her of employment opportunities or otherwise adversely affect the employment status of Ms. Brownlee, in retaliation for her requesting an accommodation.

167.   Notwithstanding said duties as set forth above, Defendant discriminated against Ms. Brownlee because of her disability.

168.   Defendant failed to provide Ms. Brownlee with a reasonable accommodation.

169.   As a direct and proximate result of Defendant's discrimination and retaliation, Ms. Brownlee has suffered and will continue to suffer lost wages, and other economic advantages of employment.

170.   As a direct and proximate result of Defendant's discrimination and retaliation, Ms. Brownlee has suffered and will continue to suffer mental/emotional pain and suffering, including but not limited to loss of enjoyment of a normal life

due to irritability, depression, anxiety, worry, humiliation, grief, sadness, anger, and panic attacks.

## COUNT VIII
## GENDER/SEXUAL HARRASMENT/DISCRIMINATION IN VIOLATION OF TITLE VII

171. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

172. At all material times, Defendant was an employer covered by, and within the meaning of, Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended.

173. Defendant's conduct, as alleged herein, violated Title VII, which makes it unlawful to sexually harass an employee or discriminate against said employee on the basis of gender.

174. A respondeat superior relationship existed because Plaintiff's supervisors, had the ability to undertake or recommend tangible decisions affecting Plaintiff or the authority to direct Plaintiff's daily work activity as alleged in the statement of facts.

175. Plaintiff is a woman and a member of a protected class.

176. Plaintiff was subjected to communication or conduct on the basis of her gender, as indicated in the facts above.

177.   The unwelcomed conduct or communication was intended to or in fact did substantially interfere with the Plaintiff's employment or created an intimidating, hostile, or offensive work environment as alleged in the statement of facts.

178.   Plaintiff notified Defendant and/or Defendant's agents of the unwelcomed conduct and communication and Defendant failed to remedy the unwelcomed conduct or communication.

179.   As a direct and proximate result of Defendant's and Defendant's agent's wrongful acts and omissions, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits and has suffered mental anguish, emotional distress, humiliation and embarrassment, loss of professional reputation, and was terminated.

180.   Plaintiff requests relief as described in the Prayer for Relief below.

## **RELIEF REQUESTED**

PLAINTIFF, CARLA BROWNLEE, respectfully requests that this Honorable Court enter judgment against Defendant as follows:

1.   Compensatory and pecuniary damages in whatever amount to which Plaintiff is entitled;

2.   Exemplary and/or punitive damages in whatever amount which Plaintiff is entitled;

3.   An award of lost wages and the value of fringe benefits, past and future;

4.      An award of interest, costs, and reasonable attorney fees; and

5.      An order awarding whatever other equitable relief appears appropriate at the time of final judgment.

Dated: October 16, 2024                Respectfully Submitted,

                                       /s/Carla D. Aikens
                                       Carla D. Aikens (P69530)
                                       CARLA D. AIKENS, P.L.C.
                                       *Attorneys for Plaintiff*
                                       615 Griswold Ste. 709
                                       Detroit, MI 48226
                                       carla@aikenslawfirm.com